GLENN HAMILTON, Appellee, v. P. E. JOHNSON & SONS, Appellants.

No. 44037.

DECEMBER 14, 1937.

REHEARING DENIED APRIL 8, 1938.

Hallagan, Fountain, Stewart & Cless, for appellants.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellee.

STIGER, J.—This action arises out of the provisions of the Workmen's Compensation Act, Code 1935, §1361 et seq.

On December 5, 1933, the claimant, Glenn Hamilton, while an employee of the defendants, was engaged in mixing lime. A piece of the lime lodged in his right eye causing an injury which resulted in its removal about a month later. Plaintiff sought compensation for permanent, partial disability under Code section 1396, subsection 16, which reads as follows:

"16. For the loss of an eye, weekly compensation during one hundred weeks."

In November, 1922, the claimant, while employed by the C. B. & Q. R. R. Co., received an injury to his right eye (the one for which compensation is now sought) by being struck by a flying nail. Hamilton filed a claim under the Workmen's Compensation Act, Compiled Code, 1919, §807 et seq., and in 1924, the railroad company paid him $1,000 as a compromise settlement. Full compensation under the act would have been $1,500. After said injury, Hamilton continued to be industrially employed until he received the injury on December 5, 1933. Claimant's left eye is normal.

Hamilton filed his petition for compensation for the injury occurring December 5, 1933. Arbitrators were waived and the case was submitted to the deputy industrial commissioner as sole arbiter, who held that claimant was not entitled to recover because the right eye was industrially blind at the time of the injury; all practical vision having been previously, permanently lost. Claimant filed a petition for review by the industrial commissioner and additional testimony was taken. The commissioner sustained the arbitration decision. Claimant then appealed to the district court which reversed the finding and decision of the industrial commissioner and awarded weekly compensation for one hundred weeks to the claimant against the defendants under Code section 1396, subsection 16.

One of the positions taken by appellants is that the claimant's eye was injured in November, 1922, while an employee of the Burlington Railroad Company, to the extent that no useful, industrial vision remained; that such injury constituted a *loss*

of the eye under Code section 1396; that when the injury occurred December 5, 1933, the claimant did not receive a compensatable injury because he had lost his eye in the first accident.

The commissioner in his decision on review held:

(1) As a result of his injury on July 5, 1933, claimant sustained no loss of useful vision.

(2) If necessary to hold that in such injury useful vision was lost, it must necessarily follow that payment required be based upon the measure of loss actually resulting therefrom.

He made the following statement in his review decision:

"Six doctors testify in this proceeding, all to the effect that only limited vision remained in the right eye after the first injury. In order to accept the testimony of the claimant and the brother-in-law or to give credence to the Ford card it is necessary to decide that all these doctors are wrong—radically wrong. This choice must be made in reaching conclusion."

The district court found that:

"The evidence does show without dispute that the claimant prior to the last injury had considerable vision in this eye and that he used it in his daily labor in driving a truck and other work. In my judgment the finding of the Commissioner that the claimant did not sustain any loss of useful vision as the result of the injury complained of is not only contrary to the great weight of the evidence but is without any support in the evidence."

The trial court reversed the finding of the commissioner and entered judgment for claimant for compensation for the loss of the right eye for one hundred weeks under Code section 1396, subsection 16.

Code section 1453, subsection 4 reads as follows:

"1453. Decision on appeal. Any order or decision of the industrial commissioner may be modified, reversed, or set aside on one or more of the following grounds and on no other: * * *

"4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

■■■ The question is whether there is sufficient, competent evidence in the record to warrant the decision made by the commissioner. If there are not sufficient facts in the record to sup-

port the finding and decision of the industrial commissioner, it will be set aside. Enfield v. Certain-Teed Products Co. et al., 211 Iowa 1004, 233 N. W. 141; Butz v. Hahn P. & V. Co., 220 Iowa 995, 263 N. W. 257.

If there is any support in the evidence for the decision of the commissioner that the right eye had no useful vision at the time of the last injury, it must be found in the medical testimony. Several lay witnesses testified to facts showing claimant had substantial industrial vision.

Dr. Sells, a witness for claimant, testified that he came to him in *1924,* after the accident in the Burlington shops and after claimant had been to Dr. La Force, who had performed an iridectomy, or a cutting out of a portion of the iris of the right eye. The witness testified that the pupil was oval, that there was a beginning cardom (curtain) or form of cataract coming in the right eye; that Hamilton had about one-fifteenth vision but with glasses had one-third vision; that he could have an operation for the cardom but Hamilton was helped with the glasses prescribed for him. The last time the witness saw Hamilton he had *one-third vision.*

Dr. La Force, oculist for the Burlington Railroad Company, testified for appellants that in November, 1922, he treated the wound in the eyeball resulting from the injury to claimant received in the Burlington shops. The witness stated that at that time it would be impossible to tell the result of the injury and whether or not the vision in the right eye was seriously impaired until later. Dr. La Force saw claimant again in 1924. The witness testified that at the time, the pupil was more or less elongated; that there was a cyst of the iris or ciliary body as a result of the injury; that a cyst has a tendency to enlarge; that *if the cyst would increase in size,* the formation of a cataract or glaucoma would be a natural development of the injury as he observed it in 1924. The witness further testified that claimant in 1924 had only one-tenth vision and that the tendency would be for the vision to gradually decrease.

Dr. Pearson examined Hamilton at the request of the industrial commissioner in July, *1924.* After testifying to the nature and extent of the wound and condition of the eye the witness stated that there was one-sixth vision in the right eye which could not be improved with lens; that ten per cent vision is not practical vision; that if one eye was normal, the injured eye,

with only ten per cent vision, would not be used at all, and a person would be for practical purposes blind as a workman; that degenerative changes are prone to develop. The witness further testified:

"When I saw this man, it appeared to me he should see better, he had received a shock and it appeared to me he should see better, but I have to report what I found and this subsequent note carries with it that feature of uncertainty which I cannot say yes or no to."

The above medical testimony refers to the condition of claimant's right eye in *1924*. The witness stated that acute glaucoma was curable, and that the hazy cornea could be caused by the lime burn. So far as shown by the record, claimant was not again examined by a physician or specialist until 1927. On September 19, 1927, Hamilton consulted Dr. Stroy, who treated the injured eye until November 30, 1927. Dr. Stroy testified for claimant as follows:

"The first day I saw him (September 19) he had a very steamy or hazy cornea which is characteristic of acute glaucoma. I saw him again on September 23, 1927, and his eye had improved, the tension was going down and his cornea was clearing up. I was then able to see a floating object just behind the iris and in front of the lens which was noticeable when he moved his eye quickly from side to side. But when his eye was stationary, straight ahead, it didn't seem to obstruct his line of vision. I presumed it to be a cyst. On September 26, he was much improved, his vision was improved, his tension had gone down and he didn't have so much pain. The cyst was about the size of an ordinary match-head. I cannot give an opinion as to how long that cyst had been there. My opinion would be it succeeded his first injury. On November 30, 1927, the tension was normal, the cornea had cleared up, he had no pain and had about 30 per cent or one-third vision in that eye. He had his first injury in 1922; he had no cataract in 1927 and in the lapse of five years the cataract should have showed up. He had a complete recovery from glaucoma. He certainly had a useful eye."

"Q. And what would you say as to whether or not the physical condition of the eye, that is the elongated shape of the pupil because of the iridectomy and this cyst and the haziness

of the cornea had reached its maximum extent at the time you saw him in 1927? A. In view of the fact it was stationary for three years, it is reasonable to presume it was stationary.''

The witness further stated that the cyst would bother him only as he moved his eyeball.

''I mean if he would focus his vision, look at it long enough for the cyst to float away, then it would not cloud over again until he shifted the eye. When he shifted the eye it would take a fraction of a second for the cyst to get out of the eye.''

Dr. Yocom testified for the claimant. Hamilton consulted Dr. Yocom after receiving the injury on December 5, 1933. The witness testified that he watched the eye from December 6, and until the cornea became so ulcerated and inflamed and the eyeball so damaged that in order to protect the vision of the left eye it was necessary to remove the eyeball, which was done on December 30, 1933. The witness testified on cross-examination that on December 13, 1933, he made a report to the insurance company in which he stated that the eyeball had previously been injured with a scarring of the cornea and that he would judge that Hamilton had no vision of value previously to the lime burn of the eyeball, and the witness testified that he was still of the same opinion. The witness further testified on cross-examination that he did not try to make a vision test because of the pain Hamilton was suffering; that he had suffered damage to the eye; that it was greatly hampering his vision. ''I'll put it that way inasmuch, as I didn't make a test of his vision to get an accurate opinion, but that vision had been greatly disturbed. It was in that belief that I made my medical report that in my opinion he did not have vision previously.''

On direct examination, the witness testified:

''I had never seen or examined the eye prior to the time that he came to me on December 6, in this inflamed condition. *I was not able to tell the extent of the old injury in detail.* I was only able to judge that there was a hazing of the cornea with some lack of roundness of the pupil and with evidence of attachment of the iris to the surrounding tissues of the eye with evidence of blurring of the cornea. The eye was so reddened when I got hold of it I could not make an exact test as to how it

was before the injury. I couldn't attempt to do that, but there was evidence of an old injury.''

The witness further testified that the amount of vision Hamilton had before the last injury could only be tested by test charts to give an accurate test of his vision.

The witness ultimately stated that Hamilton's vision was impaired and that he had some vision and just how much he was unable to determine; ''I don't think he had normal vision but he could have had some vision.''

We think a fair analysis of the testimony of Dr. Yocom is that the right eye had some vision prior to the last injury and he was unable to determine the extent of the vision because of the inflamed condition of the eye.

The medical testimony reveals that while claimant may have had only one-sixth or one-tenth vision in 1924, the prediction that the condition might grow worse and result in ultimate blindness did not come true. Dr. Sells, who examined the eye in 1924, testified that glasses improved his vision and the last time he saw him, which must have been some time after the examination by Dr. La Force and Dr. Pearson in 1924, that Hamilton had thirty-three per cent vision. The cyst did not increase in size. In 1927, Hamilton had thirty-three per cent vision without the use of glasses.

Dr. Pearson stated in answer to a hypothetical question that:

''If I found on examination in 1927 or 1928, the structure floating in the eye the size of an ordinary match-head, I would question it being a complete cyst.''

A careful examination of the record leads to the conclusion that there was no cataract.

■■■ The Workmen's Compensation Act does not prescribe a standard of industrial, useful vision, and whether there is a percentage of vision that will constitute industrial vision is a question of fact. There is no requirement that the eye be a normal one. The degree of defective vision is not the statutory measure for compensation. Though an eye may have subnormal vision at the time of the injury for which compensation is sought, due to injury or natural defects, if there is useful industrial vision and such vision is lost there is a ''loss of an eye''

under section 1396, subsection 16. See Diederich v. Tri-City R. R. Co., 219 Iowa 587, 258 N. W. 899; Daugherty v. Scandia Coal Co., 206 Iowa 120, 219 N. W. 65; Swim v. Central Iowa Fuel Co., 204 Iowa 546, 215 N. W. 603.

■■■ While there is evidence that Hamilton did not have industrial vision in 1924, the medical testimony shows there was a gradual improvement in vision from 1924 to 1933. The prediction that the injured eye might gradually lose vision and degenerative processes develop did not come true. In 1927, Hamilton had thirty-three per cent vision and the medical evidence is that such vision is useful vision. We cannot infer from Dr. Yocom's testimony that he had less than one-third vision in 1933. The commissioner based his finding that Hamilton sustained no loss of useful vision on the testimony of the physicians. We agree with the trial court that the decision of the commissioner was without support in the evidence. Hamilton testified that he had fifty per cent vision at the time of the injury. He did not have a "blind side" and as above stated, the testimony of the lay witnesses showed that Hamilton had substantial useful vision on December 5, 1933. We find no conflict in the evidence. The decision of the commissioner on review being without support in the evidence, the trial court was right in reversing the decision and rendering judgment for claimant.

■■■ Another proposition presented by appellants is that the following part of the judgment entry of the district court constitutes error:

"It is further ordered and adjudged that in computing the compensation to be paid to the claimant the same shall not be reduced on account of any injury or disability which the claimant suffered previous to the injury complained of in this action. That paragraph 8 of section 1397, Code 1935, does not apply to the situation of the claimant in the present case."

Appellants state that the above part of the judgment entry constitutes error "for the reason that if claimant had useful industrial vision, as found by the district court, the defendants had no greater obligation than the compensation value of such vision as claimant lost in defendants' service; that defendants were entitled to deduct the vision lost in the former accident, for which claimant had been paid, and the court should have so held."

This assignment of error is in accord with the second finding of the commissioner that "if necessary to hold that in such injury useful vision was lost it must necessarily follow that payment required be based upon the measure of loss actually resulting therefrom."

The contention of appellants is that in view of the medical evidence the claimant did not have over ten or fifteen per cent vision in the right eye at the time of the second accident on December 5, 1933, and that the compensation for the subsequent injury should be apportioned according to the proportion of disabilities caused by the respective injuries.

This position taken by appellants involves a construction of Code section 1396, subsection 20, and Code section 1397, subsection 8; that is, appellants rely on these two Code sections to sustain their contention.

Code section 1396, subsections 16 and 20, read as follows:

"1396. Permanent partial disabilities. Compensation for permanent partial disability shall begin at the date of injury and shall be based upon the extent of such disability, and for all cases of permanent partial disability included in the following schedule compensation shall be paid as follows: * * *

"16. For the loss of an eye, weekly compensation during one hundred weeks.

"20. In all other cases of permanent partial disability, the compensation shall bear such relation to the periods of compensation stated in the above schedule as the disability bears to those produced by the injuries named in the schedule."

Because of our holding in this opinion that the claimant sustained the loss of an eye from his last injury, the express provision of subsection 16 of section 1396 covers the claimant's loss, and subsection 20 which applies to "all other cases of permanent, partial disability" is not applicable to the situation.

Where a permanent partial disability is not specifically defined in subsections one to nineteen, inclusive, Code section 1396, compensation will be paid under subsection 20.

Code section 1397 provides the basis of computation for compensation. Subsection 8 of Code section 1397 provides that:

"8. In computing the compensation to be paid to any employee who, before the accident for which he claims compensa-

tion, was disabled and drawing compensation under the provisions of this chapter, the compensation for each subsequent injury shall be apportioned according to the proportion of disability caused by the respective injuries which he shall have suffered."

Subsection 8 of section 1397 applies only when the employee is disabled and drawing compensation under the Workmen's Compensation Act at the time of accident for which he claims compensation. Oldham v. Scofield & Welch, 222 Iowa 764, 266 N. W. 480, 269 N. W. 925; Cain v. State Industrial Accident Commission, 149 Or. 29, 37 P. 2d 353, 96 A. L. R. 1072.

The claimant Hamilton received a lump sum settlement of $1,000 in 1924. At that time his wages entitled him to $15 per week compensation so that the lump sum award divided into weeks would give him an award for sixty-six and two-thirds weeks, which period of compensation expired in 1925.

As claimant was not receiving compensation under the provisions of the act at the time of the last injury, the trial court was right in refusing to reduce compensation by the percentage of disability suffered by claimant from his first injury.

■■■ Appellants further complain of the ruling of the trial court suppressing a part of the deposition of their witness, Dr. La Force, as privileged and confidential information obtained by a physician from his patient and inadmissible under Code section 11263.

The portion of the deposition suppressed referred to information obtained by the specialist while the relation of physician and patient existed between him and Hamilton. Appellants invoke Code section 1441.

"1441. Liberal rules of evidence. While sitting as a board of arbitration, or when conducting a hearing on review, or in making any investigation or inquiry, neither the board of arbitration nor the commissioner shall be bound by common law or statutory rules of evidence or by technical or formal rules of procedure; but they shall hold such arbitrations, or conduct such hearings and make such investigations and inquiries in such manner as is best suited to ascertain and conserve the substantial rights of all parties thereto. Process and procedure under this chapter shall be as summary as reasonably may be."

Appellants state that section 11263, found in the chapter on evidence, chapter 494 of the 1935 Code, is a rule of evidence and not of substantive law and that this rule of evidence has no application to a claim under the Workmen's Compensation Act because of the provisions of section 1441.

In the case of Renner v. Model L. C. & D. Co., 191 Iowa 1288, at page 1295, 184 N. W. 611, 614, the court, in considering section 1441, stated:

"That the statute clothes the industrial commissioner with wide discretion to inquire into the 'substantial rights of the parties,' and emancipates him from observance of the common law or statutory rules of evidence and from 'technical and formal rules of procedure,' is to be conceded; but it is to be observed that this relates solely to manner and methods of procedure and to common law and statutory rules of evidence, and the commissioner is thereby authorized to make his official investigations and inquiries in a manner best suited to ascertain 'the substantial rights of the parties.' In manner and method of making such inquiries, the commissioner is not to be hampered by formal or technical rules of procedure or of evidence, but may proceed in the manner which he believes best suited to develop the truth and thus to protect the substantial rights of the parties. But he is not clothed with power or authority to change or ignore the substantive law of the jurisdiction. As bearing on this point, see the case of Carroll v. Knickerbocker Ice Co., 218 N. Y. 435 (113 N. E. 507, Ann. Cas. 1918B, 540), where the court, construing a statute quite like our own in this respect says:

"'The act may be taken to mean that, while the commission's inquiry is not limited by the common law or statutory rules of evidence or by technical or formal rules of procedure and it may in its discretion accept any evidence that is offered, still, in the end, there must be a residuum of legal evidence to support the claim, before an award can be made. * * * "There must be in the record some evidence of a sound, competent, and recognizedly probative character, to sustain the findings and award made, else the findings and award must, in fairness, be set aside by the court." ' "

We stated in the case of Flint v. Eldon, 191 Iowa 845, at page 847, 183 N. W. 344, 345:

"The purpose, intent, and scheme of workmen's compensation legislation is well understood, and its historical significance has been frequently expressed in decisions. The fundamental reason for the enactment of this legislation is to avoid litigation, lessen the expense incident thereto, minimize appeals, and afford an efficient and speedy tribunal to determine and award compensation under the terms of this act."

We agree with the appellants' contention that section 11263 is a statutory rule of evidence and that the evidence suppressed was admissible under the provisions of section 1441.

In connection with this issue we refer to Code section 1399.

"1399. Examination of injured employees. After an injury, the employee, if so requested by his employer, shall submit himself for examination at some reasonable time and place within the state and as often as may be reasonably requested, to a physician or physicians authorized to practice under the laws of this state, without cost to the employee; but if the employee requests, he shall, at his own cost, be entitled to have a physician or physicians of his own selection present to participate in such examination. The refusal of the employee to submit to such examination shall deprive him of the right to any compensation for the period of such refusal. When a right of compensation is thus suspended, no compensation shall be payable for the period of suspension."

The above section compels the employee, upon request, to submit to an examination to a physician selected by the employer. It gives the employee the privilege of having a physician of his own selection present at such an examination. If information obtained under this section by a physician is not available to the employer, the statute would serve no practical purpose. When Dr. La Force made his first examination of the claimant, soon after the injury was received at the Burlington shops, he was the oculist of the Burlington Railroad Company and we assume that Hamilton was sent to the company doctor by the employer.

We are of the opinion, however, that no evidence of value to the appellants was included in the depositions suppressed and the action of the trial court was without prejudice to the appellants. The evidence stricken referred to an examination immediately after the injury in 1922.

After reciting the condition of the eye, and the nature and cause of the wound, the witness stated that, ''It necessarily impaired the vision following an injury of that nature, but it would be impossible to tell the outcome, tell the result, because there might be a more serious injury than you really thought might have happened—occurred—the eye would be clouded from the hemorrhage so that you couldn't see for the time being so that it would be a matter of time until you could tell whether or not the vision was seriously impaired.''

In 1924, the witness again examined the claimant. He was interrogated in detail by appellants' counsel about this latter examination and the witness repeated and elaborated on the suppressed testimony all of which was admitted in evidence and considered by the trial court. The suppression of a part of the deposition did not, under the circumstances, constitute prejudicial error.

■■■ Another error asserted is that the court erred in holding the medical reports of Dr. Yocom and Dr. Pearson were inadmissible because they were hearsay statements. On December 5, 1933, Dr. Yocom made a report to the insurance carrier in which he stated:

''Diagnosis: lime burn of eyeball. This eyeball had previously been injured with a scarring of the cornea. I would judge he had no vision of value previously.''

This report was hearsay and there was no error in the court's ruling. Swim v. Central Iowa Fuel Co., 204 Iowa 546, 215 N. W. 603. Furthermore, appellants did not suffer damage by the exclusion of the report because the witness made the same statement on cross-examination that he made in the report.

■■■ With reference to the report of Dr. Pearson to the industrial commissioner offered in evidence by appellants no objection was made to the offer on the ground that it was hearsay evidence. In the absence of objection, relevant hearsay evidence may be given consideration. Reid v. Automatic E. W. Co., 189 Iowa 964, 179 N. W. 323.

Though this report in the absence of objection was admissible, Dr. Pearson gave the same testimony in his direct examination which was considered by the court and no prejudice resulted to appellants.

■■■ Appellants also complain of the action of the trial

court in holding that the exhibits from the commissioner's file regarding the former compensation claim of Hamilton v. C. B. & Q. R. R. Co., Exhibits "2 to 2 P", inclusive, were inadmissible.

The sixteen exhibits, 2 to 2 P, were from the commissioner's file in the former compensation case. With three or four exceptions, none of the exhibits has any bearing on the merits of this case. With regard to the exhibits that were material to defendants' theory of the case, the record discloses that the trial court gave them full consideration. We find no prejudicial error in this assignment or in the case.

Because there was not sufficient evidence in the case to support the finding and decision of the commissioner that Hamilton did not have useful, industrial vision at the time of the last injury, the judgment of the district court is affirmed.—Affirmed.

HAMILTON, C. J., and MITCHELL, SAGER, KINTZINGER, ANDERSON, and DONEGAN, JJ., concur.